NIMA GHARAVI
4610 North Clark St. #1098
Chicago, IL 60640
+1 (773) 899-4688
dmca@midwestwrestle.com

Plaintiff, *pro se*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| NIMA GHARAVI,<br><br>          Plaintiff,<br><br>vs.<br><br>ANUJ KUMAR,<br><br>          Defendant | Case No.: 3:25-cv-08873-TSH<br><br>**PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF EX PARTE APPLICATION FOR ENTRY OF TEMPORARY RESTRAINING ORDER, ORDER TO SHOW CAUSE WHY A PRELIMINARY INJUNCTION SHOULD NOT ISSUE, ORDER RESTRAINING TRANSFER OF ASSETS, AND ORDER PERMITTING ALTERNATIVE SERVICE**<br><br>Judge: Hon. Thomas S. Hixson<br>Date:<br>Time: 10:00 a.m.<br>Courtroom: Courtroom E – 15th Floor |

# **TABLE OF CONTENTS**

Page

I.    INTRODUCTION ...................................................................................................... 1

II.    FACTUAL BACKGROUND ..................................................................................... 2

    A.    Mr. Gharavi's Copyrighted Works and Copyright Management Information ........................... 2

    B.    Defendant's Systematic Infringement and Removal of Copyright Information ....................... 2

    C.    The DMCA Takedown and Counter-Notification Process .................................... 3

    D.    Defendant's False Counter-Notification and Agreement to Accept Service ........................... 3

    E.    Filing This Lawsuit and Attempting Service on Defendant ...................................... 4

    F.    Defendant's Escalating Misconduct After Being Notified of the Lawsuit.............................. 4

III.    ARGUMENT ............................................................................................................. 5

    A.    The Court Should Grant Mr. Gharavi's Ex Parte Application for a Temporary Restraining Order ........................................................................................................... 5

        1.    Legal Standard for Temporary Restraining Orders .......................................... 5

        2.    Mr. Gharavi Is Likely to Succeed on the Merits.............................................. 5

        3.    Mr. Gharavi Will Suffer Immediate Irreparable Harm Without a TRO ................ 9

        4.    The Balance of Hardships Tips Decidedly in Mr. Gharavi's Favor ...................... 13

        5.    The Public Interest Favors a Temporary Restraining Order ............................... 14

        6.    Ex Parte Relief Is Necessary Because Advance Notice Would Be Futile .............. 14

    B.    The Court Should Grant Mr. Gharavi's Application for an Order to Show Cause Why a Preliminary Injunction Should Not Issue ........................................................... 16

    C.    The Court Should Grant the Requested Asset Restraint Order................................ 17

        1.    Legal Authority for Asset Restraint Orders .................................................. 17

        2.    An Asset Restraint Is Necessary to Preserve Meaningful Relief......................... 18

    D.    The Court Should Not Require Mr. Gharavi to Post a Bond .................................. 19

    E.    The Court Should Permit Mr. Gharavi to Serve Defendant by Email ....................... 20

        1.    Legal Standard for Alternative Service ....................................................... 20

2.    Service by Email Is Not Prohibited by International Agreement ...........................................20

3.    Email Service Is Reasonably Calculated to Provide Actual Notice .....................................22

4.    The Particularities of This Case Necessitate Alternative Service...........................................23

IV.    CONCLUSION...............................................................................................................................24

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Adobe Sys., Inc. v. Brenengen,*

928 F. Supp. 616 (E.D.N.C. 1996).............................................................................13

*APL Microscopic, LLC v. Steenblock,*

2022 WL 4830687 (9th Cir. Oct. 3, 2022).....................................................................7

*C.B. Fleet Co., Inc. v. Unico Holdings, Inc.,*

510 F. Supp. 2d 1078 (S.D. Fla. 2007) ........................................................................13

*CBS, Inc. v. PrimeTime 24 Joint Venture,*

9 F. Supp. 2d 1333 (S.D. Fla. 1998) ............................................................................13

*Chanel, Inc. v. Individuals, Partnerships & Unincorporated Associations Identified on Schedule "A",*

2020 WL 8226841 (S.D. Fla. Nov. 4, 2020)................................................................21

*Cisco Systems, Inc. v. Shenzhen Usource Tech. Co.,*

2020 WL 4196273 (N.D. Cal. July 20, 2020)................................................11, 12, 18

*Comet Techs. United States of Am. Inc. v. Beuerman,*

2018 WL 1990226 (N.D. Cal. Mar. 15, 2018).............................................................19

*cPanel, LLC v. Asli,*

719 F. Supp. 3d 1133 (D. Or. 2024) ................................................................18, 19, 20

*Disney Enterprises, Inc. v. VidAngel, Inc.,*

869 F.3d 848 (9th Cir. 2017) ..........................................................................11, 12, 14

*E. Bay Sanctuary Covenant v. Trump,*

932 F.3d 742 (9th Cir. 2018) ........................................................................................15

*F.D.I.C. v. Garner,*

125 F.3d 1272 (9th Cir. 1997) .....................................................................................18

*Facebook, Inc. v. Banana Ads, LLC,*

2012 WL 1038752 (N.D. Cal. Mar. 27, 2012).............................................................21

*Granny Goose Foods, Inc. v. Brotherhood of Teamsters & Auto Truck Drivers Local No. 70,*

415 U.S. 423 (1974).....................................................................................................15

*Invisible Narratives v. Next Level Apps Tech., FZCO,*

    2025 WL 551866 (N.D. Cal. Feb. 19, 2025) ................................................................19, 20, 23

*Johnson v. Couturier,*

    572 F.3d 1067 (9th Cir. 2009) ...........................................................................................18

*Jorgensen v. Cassiday,*

    320 F.3d 906 (9th Cir. 2003) .............................................................................................19

*Lenz v. Universal Music Corp.,*

    815 F.3d 1145 (9th Cir. 2016) .........................................................................................8, 9

*Logan v. Meta Platforms, Inc.,*

    636 F. Supp. 3d 1052 (N.D. Cal. Oct. 25, 2022) .................................................................7

*Mango v. BuzzFeed, Inc.,*

    970 F.3d 167 (2d Cir. 2020)............................................................................................6, 7

*McGucken v. Chive Media Grp., LLC,*

    2018 WL 3410095 (C.D. Cal. July 11, 2018)..................................................................6, 7

*McGucken v. DMI Holdings,*

    2019 WL 2970831 (C.D. Cal. Apr. 9, 2019) .......................................................................8

*Media Trademark & Licensing Ltd. v. COINGEEKLTD.COM,*

    2021 WL 2895289 (D. Ariz. July 9, 2021)........................................................................21

*Microsoft Corp. v. Goldah.com Network Tech. Co.,*

    2017 WL 4536417 (N.D. Cal. Oct. 11, 2017)....................................................................21

*Murphy v. Millennium Radio Grp. LLC,*

    650 F.3d 295 (3d Cir. 2011)................................................................................................6

*Richmond Techs., Inc. v. Aumtech Bus. Sols.,*

    2011 WL 2607158 (N.D. Cal. July 1, 2011)................................................................22, 24

*Rio Props., Inc. v. Rio Int'l Interlink,*

    284 F.3d 1007 (9th Cir. 2002) ...........................................................1, 20, 22, 23, 24

*Rossi v. Motion Picture Ass'n of Am. Inc.,*

    391 F.3d 1000 (9th Cir. 2004) ............................................................................................8

*Trial Film LLC v. Wu Daoai,*

    2021 WL 2949508 (D. Ariz. July 14, 2021) ................................................................... 18

*Viral DRM LLC v. YouTube Uploaders Listed on Schedule A,*

    2023 WL 5601146 (N.D. Cal. Aug. 29, 2023) .................................. 1, 9, 10, 11, 16, 18

*Washington v. Trump,*

    847 F.3d 1151 (9th Cir. 2017) ............................................................................. 5, 10

*Water Splash, Inc. v. Menon,*

    137 S. Ct. 1504 (2017) ........................................................................................ 21

*Williams-Sonoma Inc. v. Friendfinder Inc.,*

    2007 WL 1140639 (N.D. Cal. Apr. 17, 2007) ...................................................... 21

*Winter v. Nat. Res. Def. Council, Inc.,*

    555 U.S. 7 (2008) ...................................................................................... 5, 10, 13

*Zoho Corp. v. Target Integration, Inc.,*

    2023 WL 2837676 (N.D. Cal. Apr. 7, 2023) ........................................................ 22

**Statutes**

17 U.S.C. § 1202 ................................................................................................... 6, 7

17 U.S.C. § 1203 ...................................................................................................... 17

17 U.S.C. § 502 ........................................................................................................ 17

17 U.S.C. § 512 ............................................................................................... 8, 9, 12

**Rules**

Fed. R. Civ. P. 4 ...................................................................................................... 20

Fed. R. Civ. P. 65 ........................................................................................... 5, 15, 19

**Other Authorities**

S. Rep. No. 105-190

    (1998) ..................................................................................................................... 14

## I.    INTRODUCTION

Plaintiff Nima Gharavi ("Mr. Gharavi") seeks four forms of immediate relief: (1) a temporary restraining order halting ongoing copyright infringement and false DMCA representations; (2) an order to show cause why a preliminary injunction should not issue; (3) an order restraining transfer of assets to preserve recoverable funds; and (4) an order permitting service by email. Each form of relief is independently justified and collectively necessary to protect Mr. Gharavi's federal statutory rights and prevent a foreign infringer from dissipating the only U.S.-based assets before the Court can adjudicate the merits.

Defendant Anuj Kumar ("Defendant") operates two profitable YouTube channels from India, generating AdSense revenue from Mr. Gharavi's copyrighted videos after removing copyright watermarks and adding false ownership logos. Defendant filed false DMCA counter-notifications claiming fair use under penalty of perjury. After being notified of this lawsuit, Defendant filed two more false counter-notifications, demonstrating his intent to escalate unlawful conduct unless immediately enjoined.

An asset restraint is critical. Defendant's AdSense funds—currently held by Google in California—are the only recoverable U.S.-based assets. As detailed in Section III.A.6, once these funds are disbursed to India, they will be practically irretrievable. This district has granted identical relief in substantially similar circumstances involving foreign YouTube infringers who monetize copyrighted content. *See Viral DRM LLC v. YouTube Uploaders Listed on Schedule A*, No. 3:23-CV-04300, 2023 WL 5601146, at *3-4 (N.D. Cal. Aug. 29, 2023).

Email service is appropriate under Federal Rule of Civil Procedure 4(f)(3). Defendant consented to "accept service of process" in his counter-notification and actively uses six email addresses for all dispute communications. The Ninth Circuit has held that email service is reasonably calculated to provide notice when defendants embrace email technology in their business operations. *Rio Props., Inc. v. Rio Int'l Interlink*, 284 F.3d 1007, 1016-17 (9th Cir. 2002). Although India has objected to Article 10 of the Hague Convention, courts in this district routinely authorize email service to Indian defendants, particularly where traditional service would cause prohibitive delay. Hague Convention service would take six to eight months—time the Court's jurisdiction over the only recoverable assets cannot afford.

## II.    FACTUAL BACKGROUND

### A.  Mr. Gharavi's Copyrighted Works and Copyright Management Information

Mr. Gharavi creates, films, and produces original audiovisual content. Gharavi Decl. ¶ 3. At issue in this case, he has created six copyrighted videos, each containing substantial original creative content. *Id.*

Each video contains a visible watermark displaying either "© Women.MidwestWrestle.com" or "© MidwestWrestle.com" at the bottom of the video frame throughout the entire video. *Id.* ¶ 4. This watermark appears prominently on every frame, identifying Mr. Gharavi as the copyright owner. *Id.*, Ex. 1 (side-by-side screenshots).[1]

On August 30, 2025, Mr. Gharavi filed copyright registration applications for all six videos with the U.S. Copyright Office. *Id.* ¶ 5. These registrations are currently pending.

### B.  Defendant's Systematic Infringement and Removal of Copyright Information

Defendant identified himself as the operator of @RockyFunTV (764,000 subscribers) in his DMCA counter-notification filed on October 9, 2025. *Id.* ¶ 6, Ex. 4. Mr. Gharavi knows that Defendant also operates @GrapplingFightZone (6,940 subscribers) because Defendant used the same email address (kpanuj34@gmail.com) to send emails representing himself as the operator of both channels. *Id.* ¶ 6.

Defendant systematically published 17 infringing works to these channels that reproduce Mr. Gharavi's copyrighted works: 15 videos and one thumbnail to @RockyFunTV, and one video to @GrapplingFightZone. *Id.* ¶¶ 6-9, Ex. 1. In all instances, Defendant deliberately cropped out or removed Mr. Gharavi's copyright watermark (either "© Women.MidwestWrestle.com" or "© MidwestWrestle.com" depending on which original video was copied). *Id.*, Ex. 1 (side-by-side screenshots). The removal was not accidental—the watermark appears throughout every frame of Mr. Gharavi's original videos, and Defendant's versions show substantially similar content with the watermark region removed. *Id.*

In three of the videos, Defendant went further and added a false "Rocky!" logo, falsely suggesting

---

[1] Mr. Gharavi preserved electronic copies of the infringing videos. The side-by-side screenshot comparisons in Exhibit 1 provide the most direct visual demonstration of the copyright management information removal and falsification at issue in this case; however, complete preserved videos can be lodged with the Court upon request.

that Rocky Fun TV owned the copyright to the works. *Id.* ¶ 8, Ex. 1 at 6, 19, 24.[2] This constitutes the provision of false copyright management information prohibited by 17 U.S.C. § 1202(a).

One additional infringing work consists of a thumbnail image for a video, where Defendant again removed Mr. Gharavi's watermark. *Id.* ¶ 9, Ex. 1 at 7-10.

Defendant monetized all of the videos through YouTube's AdSense program, earning advertising revenue from Mr. Gharavi's stolen content. *Id.* ¶ 10. These AdSense funds represent the only U.S.-based assets traceable to Defendant's unlawful conduct. *Id.* ¶ 29.

### C.  The DMCA Takedown and Counter-Notification Process

Between October 3-6, 2025, Mr. Gharavi submitted 17 DMCA takedown notices to YouTube, identifying the infringing videos and requesting their removal under the Digital Millennium Copyright Act, 17 U.S.C. § 512(c). Gharavi Decl. ¶ 11, Ex. 2 (DMCA takedown notices and YouTube acknowledgments). YouTube acknowledged receipt of 16 DMCA takedown notices and temporarily removed those 16 videos. *Id.* YouTube declined the 17th request (regarding a thumbnail image), stating: "Request declined. We've reviewed this matter and found that the copyrighted work you identified doesn't seem to appear in the video(s) listed below." *Id.*, Ex. 2 at 83.

Between October 5-8, 2025, Defendant sent Mr. Gharavi 19 emails from six different email addresses disputing the takedowns. *Id.* ¶¶ 12-13, Ex. 3. Defendant used the same email address (kpanuj34@gmail.com) to send emails representing himself as the operator of both @RockyFunTV and @GrapplingFightZone, confirming that the same individual operates both channels. *Id.* ¶ 6.

### D.  Defendant's False Counter-Notification and Agreement to Accept Service

On October 9, 2025, Defendant filed a formal DMCA counter-notification with YouTube regarding one of the removed videos. *Id.* ¶ 14, Ex. 4. In the counter-notification, Defendant stated under penalty of perjury:

"I swear, under penalty of perjury, that I have a good faith belief the material was removed due to a mistake or misidentification of the material to be removed or disabled."

*Id.* ¶ 15, Ex. 4 at 3. This statement is demonstrably false. The video reproduces Mr. Gharavi's copyrighted work but has been modified by removing the watermark. *Id.* ¶ 16, Ex. 1 at 41-44 (side-by-

---

[2]  For clarity, pincites to exhibits refer to the ECF-stamped page numbering.

MEMORANDUM OF LAW ISO APP. FOR TRO, OSC FOR PRELIM. INJ., ASSET RESTRAINT AND ALT. SERVICE
CASE NO.: 3:25-cv-08873-TSH

side comparisons showing watermark removal and other modifications).

Critically, Defendant also stated in his counter-notification:

"I consent to the jurisdiction of the Federal District Court for the district in which my address is located, or if my address is outside of the United States, the judicial district in which YouTube is located, and will accept service of process from the claimant."

*Id.* ¶ 18, Ex. 4 at 3.

### E. Filing This Lawsuit and Attempting Service on Defendant

After receiving Defendant's counter-notification, Mr. Gharavi filed this lawsuit on October 16, 2025. *Id.* ¶ 20. On October 19, 2025, Mr. Gharavi attempted service by sending a comprehensive service package by email to all six email addresses Defendant had actively used to communicate about this dispute. *Id.* ¶¶ 21-22, Ex. 5. The package included the summons, the filed complaint with all exhibits, a request for waiver of service under Federal Rule of Civil Procedure 4(d), Local Rules, and other required documents. *Id.* None of the emails bounced or generated delivery failures. *Id.* ¶ 38.

On October 20, 2025, YouTube sent Mr. Gharavi an email confirming receipt of the ECF-stamped complaint and stating: "The content at issue won't be reinstated while legal action is in progress." *Id.* ¶ 23, Ex. 6.

On October 26, 2025—one week after his initial service attempt—Mr. Gharavi sent a follow-up email to all six addresses requesting acknowledgment of receipt. *Id.* ¶ 24, Ex. 9. Again, none of the emails bounced. *Id.* ¶ 38.

### F. Defendant's Escalating Misconduct After Being Notified of the Lawsuit

On October 25, 2025—six days after Mr. Gharavi's service attempt—Defendant filed two additional DMCA counter-notifications with YouTube. *Id.* ¶¶ 25-27, Exs. 7-8. The October 9 counter-notification contained the false statement under penalty of perjury claiming removal "due to a mistake or misidentification," and based on YouTube's standardized process, both October 25 counter-notifications necessarily contained the same certification. *Id.* ¶ 26.

YouTube rejected both counter-notifications because Defendant used email addresses that did not match the YouTube account owners. *Id.* ¶ 28, Ex. 8 ("The email address that you have provided does not match the email address of the account in question. In order for us to process your counter notification,

you must be the owner of the account."). This demonstrates Defendant's pattern of using multiple email addresses and providing inconsistent information—the same deceptive conduct reflected in his use of six different email addresses. *Id.* ¶¶ 12-13, 36, Ex. 3.

Despite being notified of this lawsuit and YouTube's explicit statement that the content would not be reinstated "while legal action is in progress," Defendant filed two more false counter-notifications. This escalating pattern of misconduct—filing three counter-notifications within 16 days, each containing knowingly false statements under penalty of perjury—demonstrates that Defendant will not be deterred by legal action and cannot be trusted to preserve assets or cease his unlawful conduct absent a court order.

## III.    ARGUMENT

### A. The Court Should Grant Mr. Gharavi's Ex Parte Application for a Temporary Restraining Order

#### 1.  Legal Standard for Temporary Restraining Orders

A temporary restraining order may be issued without notice to the adverse party if: (1) specific facts in an affidavit or a verified complaint clearly show that immediate and irreparable injury, loss, or damage will result to the movant before the adverse party can be heard in opposition, and (2) the movant's attorney certifies in writing any efforts made to give notice and the reasons why it should not be required. Fed. R. Civ. P. 65(b)(1).

To obtain a TRO, the moving party must demonstrate: (1) a likelihood of success on the merits; (2) a likelihood of irreparable harm in the absence of preliminary relief; (3) that the balance of equities tips in the movant's favor; and (4) that an injunction is in the public interest. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). These are the same factors courts apply when evaluating requests for preliminary injunctions. *Washington v. Trump*, 847 F.3d 1151, 1159 n.3 (9th Cir. 2017).

Mr. Gharavi satisfies all four factors and demonstrates that *ex parte* relief is necessary to prevent immediate dissipation of the only recoverable assets.

#### 2.  Mr. Gharavi Is Likely to Succeed on the Merits

Mr. Gharavi is highly likely to prevail on his claims for: (a) removal of copyright management information under 17 U.S.C. § 1202(b); (b) providing false copyright management information under 17 U.S.C. § 1202(a); and (c) DMCA misrepresentation under 17 U.S.C. § 512(f).

### a.   Removal of Copyright Management Information (17 U.S.C. § 1202(b))

Section 1202(b) prohibits both (1) the intentional removal or alteration of copyright management information, and (3) the distribution of works knowing that copyright management information has been removed, when either act is done "knowing, or, with respect to civil remedies under section 1203, having reasonable grounds to know, that it will induce, enable, facilitate, or conceal an infringement." 17 U.S.C. § 1202(b)(1), (3). "Copyright management information" includes "the name of, and other identifying information about, the copyright owner of the work, including the information set forth in a notice of copyright." *Id.* § 1202(c)(3).

Courts have consistently held that visible identifying information about the copyright owner constitutes CMI under § 1202(c). *Murphy v. Millennium Radio Grp. LLC*, 650 F.3d 295, 305 (3d Cir. 2011) (photographer's name in credit line is CMI); *Mango v. BuzzFeed, Inc.*, 970 F.3d 167, 172 (2d Cir. 2020) (gutter credits constitute CMI); *McGucken v. Chive Media Grp., LLC*, No. CV 18-01612-RSWL-KS, 2018 WL 3410095, at *4 (C.D. Cal. July 11, 2018) (watermark identifying author and owner qualifies as protectable CMI).

Here, Mr. Gharavi's watermarks—either "© Women.MidwestWrestle.com" or "© MidwestWrestle.com" depending on the specific video—unquestionably constitute copyright management information under § 1202(c). Each watermark includes identifying information about the copyright owner—specifically a copyright symbol (©) and the owner's website name—satisfying the statutory definition. Gharavi Decl. ¶ 4; Ex. 1. These watermarks appear visibly throughout every frame of each of Mr. Gharavi's six original videos. *Id.*

Defendant intentionally removed the copyright management information from all 17 infringing works by employing multiple editing techniques—cropping the video to exclude the watermark, covering it with text overlays, and reducing video dimensions. *Id.* ¶ 27, Ex. 1. These modifications required affirmative action and were designed to prevent identification of Mr. Gharavi as the copyright owner, demonstrating this removal was deliberate rather than accidental.

Because Mr. Gharavi provided original images of the works bearing the watermarks and screenshots of the works on Defendant's YouTube channels without those watermarks, and because Mr. Gharavi plausibly alleges that Defendant controlled the channels where the videos appear, the Court can

draw a "reasonable inference" that Defendant knowingly removed the CMI. *See APL Microscopic, LLC v. Steenblock*, No. 21-55745, 2022 WL 4830687, at *2 (9th Cir. Oct. 3, 2022) (reversing dismissal where plaintiff provided original images bearing watermark and screenshots of works on defendant's social media pages without watermark, finding circumstantial evidence sufficient to support § 1202(b) claim); *McGucken v. Chive Media Grp.*, 2018 WL 3410095, at *4-5 (finding that where exhibit shows subject photographs contain watermark and the only difference in the subject posts is that CMI is missing, it is plausible that defendant removed the CMI).

Unlike *Logan v. Meta Platforms, Inc.*, 636 F. Supp. 3d 1052, 1064 (N.D. Cal. Oct. 25, 2022)—where the court held that passive embedding cannot plead intentionality—Defendant here engaged in active removal. He deliberately cropped and edited Mr. Gharavi's videos to exclude the watermark region before uploading them to his own YouTube channels. This affirmative action satisfies the intentionality requirement under § 1202(b)(1).

Defendant then distributed these videos on YouTube, knowing that the copyright management information had been removed, and knowing that the removal would "induce, enable, facilitate, or conceal" infringement. 17 U.S.C. § 1202(b)(3). By removing the watermark, Defendant concealed the fact that the videos belonged to Mr. Gharavi and falsely implied that Defendant had the right to upload and monetize them. This is precisely the type of conduct § 1202(b) was designed to prohibit.

Moreover, Defendant acted with the specific intent to induce, enable, facilitate, or conceal infringement—which is established by his knowing and intentional distribution of the works with the CMI removed. *See Mango v. BuzzFeed, Inc.*, 970 F.3d at 172 ("a defendant's awareness that distributing copyrighted material without proper attribution of CMI will conceal his own infringing conduct satisfies the DMCA's second scienter requirement"). Defendant's monetization of the videos through Google AdSense after removing Mr. Gharavi's watermark demonstrates his awareness that the removal would conceal his infringement and enable him to profit from Mr. Gharavi's works.

Mr. Gharavi is highly likely to prevail on all 17 counts of § 1202(b) violations.

**b. Providing False Copyright Management Information (17 U.S.C. § 1202(a))**

Section 1202(a) prohibits knowingly providing false copyright management information with intent to induce, enable, facilitate, or conceal infringement. 17 U.S.C. § 1202(a)(1). In three videos,

Defendant not only removed Mr. Gharavi's watermark but also knowingly added a false "Rocky!" logo suggesting Rocky Fun TV owned the copyright. Gharavi Decl. ¶ 8, Ex. 1 at 6, 19, 24. By adding this false attribution after removing the true copyright owner's watermark, Defendant provided false CMI knowing it would conceal his infringement and facilitate his monetization of Mr. Gharavi's works on his own channel. Courts have held that adding false attribution information after removing the true CMI satisfies § 1202(a). *See McGucken v. DMI Holdings*, No. CV184837DSFGJSX, 2019 WL 2970831, at *3 (C.D. Cal. Apr. 9, 2019).

Mr. Gharavi is highly likely to prevail on these three counts of § 1202(a) violations.

### c.  DMCA Misrepresentation (17 U.S.C. § 512(f))

Section 512(f) provides that any person who knowingly materially misrepresents that "material or activity was removed or disabled by mistake or misidentification" shall be liable for damages, including costs and attorneys' fees, incurred by the copyright owner who is injured by such misrepresentation as a result of the service provider relying upon such misrepresentation in replacing the removed material or ceasing to disable access to it. 17 U.S.C. § 512(f)(2).

"Congress included an expressly limited cause of action for improper infringement notifications, imposing liability only if the [party's] notification is a knowing misrepresentation." *Lenz v. Universal Music Corp.*, 815 F.3d 1145, 1154 (9th Cir. 2016); *Rossi v. Motion Picture Ass'n of Am. Inc.*, 391 F.3d 1000, 1005 (9th Cir. 2004) ("A [party] cannot be liable simply because an unknowing mistake is made, even if the [party] acted unreasonably in making the mistake. Rather, there must be a demonstration of some actual knowledge of misrepresentation on the part of the [party]." (citation omitted)). Moreover, a party "who pays lip service to the consideration of fair use by claiming it formed a good faith belief when there is evidence to the contrary is still subject to § 512(f) liability." *Lenz*, 815 F.3d at 1154.

Here, Defendant filed a DMCA counter-notification stating under penalty of perjury: "I swear, under penalty of perjury, that I have a good faith belief the material was removed due to a mistake or misidentification of the material to be removed or disabled." Gharavi Decl. ¶¶ 14-15, Ex. 4. This statement is objectively false and constitutes a knowing material misrepresentation.

The videos were not removed "due to a mistake or misidentification." Defendant deliberately removed Mr. Gharavi's watermark before uploading the works. *Id.* ¶¶ 7, 16, 27, Ex. 1. The side-by-side

screenshots prove this systematic removal. *Id.* There is no "mistake" and no "misidentification." Defendant knew exactly what he was doing.

Defendant also knew the statement was false when he made it. He had received Mr. Gharavi's DMCA takedown notices explaining that the videos reproduced Mr. Gharavi's copyrighted works. *Id.* ¶ 11, Ex. 2. Most tellingly, he had to *affirmatively remove* Mr. Gharavi's watermark through deliberate cropping, overlays, or reformatting before uploading the videos—acts that demonstrate actual knowledge that the content belonged to someone else. *Id.* ¶ 16, Ex. 1. Defendant then swore under penalty of perjury that the removal was a "mistake." This is the paradigmatic case of a knowing misrepresentation under *Rossi*—not an unknowing mistake, but deliberate falsity with actual knowledge.

The misrepresentation caused actual injury to Mr. Gharavi. Under the DMCA's counter-notification procedures, YouTube must restore the video within 10-14 business days unless the copyright owner files a lawsuit. 17 U.S.C. § 512(g)(2)(C). Defendant's false counter-notification forced Mr. Gharavi to dedicate substantial time and financial resources to this lawsuit as a *pro se* party, or abandon removal of the infringing content. Gharavi Decl. ¶ 17. Section 512(f) authorizes recovery of damages, including costs and attorneys' fees, for such injuries. *See Lenz*, 815 F.3d at 1156.

This district granted preliminary injunctive relief on § 512(f) claims in factually similar circumstances. In *Viral DRM*, the court found plaintiffs established "a strong probability of proving at trial" that foreign YouTube uploaders "submitted false 'put-back' or counternotices in violation of 17 U.S.C. § 512(f)" when they "responded to DMCA takedown notices with false and misleading counternotices in which they falsely and in bad faith claimed to have the rights to display [plaintiff's] videos on YouTube." 2023 WL 5601146, at *2. Here, Defendant similarly filed a counter-notification containing knowingly false statements. Gharavi Decl. ¶¶ 14-15, Ex. 4. His subsequent filing of two additional counter-notifications on October 25, 2025—six days after being notified of this lawsuit—demonstrates a deliberate pattern of perjured statements made under penalty of law. *Id.* ¶¶ 25-28, Exs. 7-8.

Mr. Gharavi is highly likely to prevail on his § 512(f) claim.

### 3.    Mr. Gharavi Will Suffer Immediate Irreparable Harm Without a TRO

In the Ninth Circuit, the standard for issuing a temporary restraining order is substantially

identical to issuing a preliminary injunction. *Washington*, 847 F.3d at 1159 n.3. A plaintiff seeking such relief must establish that "he is likely to suffer irreparable harm in the absence of preliminary relief." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). A preliminary injunction may issue only upon a showing "that irreparable injury is *likely* in the absence of an injunction." *Id.* at 22.

Mr. Gharavi faces two distinct forms of immediate and irreparable harm: (1) loss of the ability to collect on any judgment due to likely asset dissipation to a non-reciprocal jurisdiction; and (2) irreparable procedural harm from Defendant's abuse of the DMCA counter-notification system, which threatens to force restoration of infringing content and repeated litigation. Each independently justifies granting the TRO.

**First**, and most critically, Mr. Gharavi will lose the ability to collect on any judgment to the extent the AdSense funds are dissipated. Defendant is located in India, and these AdSense funds represent the only practical means of recovering any damages in this case. Gharavi Decl. ¶ 19, Ex. 4. The United States has no bilateral treaty with India for enforcement of civil judgments. This means that even if Mr. Gharavi obtains a substantial judgment, it will be worthless once these funds are disbursed to Defendant's accounts in India.

The AdSense funds Defendant has earned from monetizing Mr. Gharavi's stolen content represent the only U.S.-based assets traceable to this case. *Id.* ¶ 29. These funds are currently held by Google LLC in California. *Id.* According to Google's publicly available AdSense payment policy, disbursements are processed monthly between the 21st and 26th of each month, provided the account balance exceeds the payment threshold and no payment holds exist. *Id.* ¶ 31, Ex. 10. Once Google transfers the funds to Defendant's accounts in India during a scheduled payment window, those funds will be practically irretrievable. *Id.* ¶¶ 32-33. Given Defendant's 764,000-subscriber channel, the account balance is highly likely to exceed the payment threshold. *Id.* ¶ 10. Google's recurring monthly disbursement window runs through November 26, 2025, with subsequent windows recurring monthly on the same schedule thereafter, making each passing payment window an opportunity for additional funds to dissipate irretrievably beyond the Court's reach.

This district confronted a substantially similar situation in *Viral DRM*, 2023 WL 5601146. There, the court granted an *ex parte* TRO with an asset restraint where foreign YouTube uploaders monetized

pirated videos and filed false DMCA counter-notifications. The defendants resided "outside the United States in countries with weak legal regimes and copyright protections where pursuing defendants for recovery of plaintiff's damages will be impossible." *Id.* at *2. The court found that absent an immediate asset restraint, "defendants can and, based upon plaintiff's counsel's past experience, will significantly alter the status quo before the Court can determine the parties' respective rights." *Id.*

Here, the risk of dissipation is not merely speculative—it is demonstrated by Defendant's pattern of conduct: (1) removing copyright management information from 16 videos and one thumbnail, (2) adding false CMI to three videos, (3) filing a counter-notification with knowingly false statements under penalty of perjury, and (4) filing two more false counter-notifications after being notified of this lawsuit. Gharavi Decl. ¶¶ 6-9, 14, 25, Exs. 4, 7. This pattern establishes both motive and demonstrated willingness to conceal wrongdoing.

Moreover, Defendant has already been notified of this lawsuit. *Id.* ¶¶ 21, 24, Exs. 5, 9. *Ex parte* relief is necessary to restrain the account before additional disbursements occur.

Without the asset restraint, Mr. Gharavi will obtain a judgment against a defendant in a non-reciprocal jurisdiction with no practical means of collection. Recovery would require costly proceedings in Indian courts with substantial risk of asset dissipation. Courts recognize that this risk of asset dissipation and inability to collect against foreign defendants justifies preliminary injunctive relief. *Viral DRM*, 2023 WL 5601146, at *3-4; *Cisco Systems, Inc. v. Shenzhen Usource Tech. Co.*, No. 5-20-CV-04773-EJD, 2020 WL 4196273, at *9-10 (N.D. Cal. July 20, 2020). In addition, ongoing infringement causes immediate and irreparable harm to Mr. Gharavi's goodwill and control over his works—harms that cannot be adequately remedied by monetary damages alone. *Disney Enterprises, Inc. v. VidAngel, Inc.*, 869 F.3d 848, 865-66 (9th Cir. 2017).

**Second**, and independently, Mr. Gharavi suffers irreparable procedural harm from Defendant's abuse of the DMCA counter-notification system, which threatens to force restoration of the infringing content and all associated harms. Defendant has systematically removed Mr. Gharavi's watermarks from 16 videos and one thumbnail, published them to channels with 770,000+ combined subscribers, and monetized them. Gharavi Decl. ¶¶ 6-7, 9-10. When viewers saw these works without Mr. Gharavi's watermark, they could not identify him as the creator. *Id.* ¶ 42. Worse, Defendant added a false "Rocky!"

logo to three videos, affirmatively misattributing them to Rocky Fun TV. *Id.* ¶¶ 8, 43, Ex. 1 at 6, 19, 24.

Although these videos have now been removed, Defendant's false counter-notifications threaten to restore this infringing content and all the associated harms. The DMCA's notice-and-takedown regime under 17 U.S.C. § 512 is designed to balance copyright owners' rights with users' interests. When that system is abused through knowingly false counter-notifications filed under penalty of perjury, it inflicts irreparable procedural harm that cannot be remedied by damages.

Defendant has filed three counter-notifications in 16 days—October 9, October 25 (twice)—each necessarily containing the same false statement under penalty of perjury: that the videos were removed by "mistake or misidentification." *Id.* ¶¶ 14-15, 25-26, Exs. 4, 7. Most critically, Defendant filed the latter two counter-notifications *after* being notified of this lawsuit on October 19. *Id.* ¶¶ 21, 25. This demonstrates a pattern of deliberate abuse of the DMCA process, even in the face of pending federal litigation.

Each false counter-notification forces Mr. Gharavi into an untenable choice: either (1) file a new lawsuit within 10-14 business days to prevent YouTube from restoring the infringing content, or (2) allow the content to be restored. 17 U.S.C. § 512(g)(2)(C). This creates a cycle of repeated litigation that is itself a form of irreparable harm. Even though YouTube has temporarily paused restoration of the first disputed video and rejected the two October 25 counter-notifications, Defendant's filing of two additional counter-notifications demonstrates he will continue this abusive pattern absent court intervention. Gharavi Decl. ¶¶ 23, 28, Exs. 6, 8.

Should YouTube restore infringing content, all attribution and creative control harms recur. Viewers cannot identify Mr. Gharavi as creator of works displayed to 770,000+ subscribers. Loss of goodwill and control over one's works cannot be remedied by monetary damages. *Disney*, 869 F.3d at 865-66; *Cisco*, 2020 WL 4196273, at *7.

This procedural harm is distinct from the underlying copyright infringement. It is harm to Mr. Gharavi's ability to use the DMCA's takedown procedures without being forced into serial federal litigation. Each false counter-notification filed under penalty of perjury is an independent act of bad faith that undermines the integrity of the statutory scheme Congress created. The pattern here—three false statements under penalty of perjury in 16 days, with two coming *after* notice of federal litigation—

demonstrates that this harm will continue and escalate absent immediate court intervention.

Money damages cannot remedy this harm. No damage award can compensate Mr. Gharavi for the ongoing procedural burden of responding to repeated false counter-notifications, nor can it deter Defendant from continuing to abuse the DMCA process. Only injunctive relief can prevent the ongoing abuse of the DMCA's counter-notification process and protect Mr. Gharavi's ability to enforce his copyright through the statutory mechanisms Congress provided.

For all these reasons, Mr. Gharavi faces immediate and irreparable harm across two independent dimensions: economic (loss of collectability through asset dissipation) and procedural (abuse of DMCA process threatening forced restoration of infringing content). Each form of harm independently justifies granting the TRO. Collectively, they compel immediate *ex parte* relief.

### 4. The Balance of Hardships Tips Decidedly in Mr. Gharavi's Favor

"In exercising their sound discretion, courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction." *Winter*, 555 U.S. at 24. Because Defendant's business model depends on systematic copyright infringement, he will suffer no legitimate hardship if enjoined from continuing unlawful conduct.

The temporary restraining order would simply require Defendant to: (1) cease filing false DMCA counter-notifications, (2) stop removing copyright management information, (3) stop providing false copyright management information, and (4) refrain from withdrawing AdSense funds earned through infringement. None of these restrictions imposes any hardship on lawful activity. Defendant has no right to engage in any of this conduct.

Because Defendant is engaged in infringement, "the only hardship he will suffer as a result of an injunction is court-ordered compliance with the copyright laws." *Adobe Sys., Inc. v. Brenengen*, 928 F. Supp. 616, 618 (E.D.N.C. 1996). Moreover, "a company cannot build a business on infringements and then argue that enforcing the law will cripple that business." *C.B. Fleet Co., Inc. v. Unico Holdings, Inc.*, 510 F. Supp. 2d 1078, 1083 (S.D. Fla. 2007) (quoting *CBS, Inc. v. PrimeTime 24 Joint Venture*, 9 F. Supp. 2d 1333, 1345 (S.D. Fla. 1998)).

By contrast, without relief Mr. Gharavi will lose: (1) the ability to collect damages, (2) control over his creative works, (3) attribution for his content, and (4) any remedy for Defendant's systematic

violations. The balance of hardships tips decidedly in Mr. Gharavi's favor.

### 5.  The Public Interest Favors a Temporary Restraining Order

The public has a strong interest in enforcing copyright laws and deterring violations of the DMCA's copyright management information provisions. Congress enacted § 1202 specifically to protect copyright management information, recognizing that "Copyright Management Information (CMI) is an important element in establishing an efficient Internet marketplace in copyrighted works free from governmental regulation." S. Rep. No. 105-190, at 16 (1998). "Such information will assist in tracking and monitoring uses of copyrighted works, as well as licensing of rights and indicating attribution, creation and ownership." *Id.*

Allowing infringers to systematically remove copyright management information, file false DMCA counter-notifications, and then dissipate the proceeds of their unlawful conduct would:

- Undermine the DMCA's protective framework
- Encourage foreign-based infringers to exploit U.S. copyright owners, knowing they can dissipate assets beyond collection
- Harm individual content creators who rely on copyright protection
- Diminish respect for copyright law and the integrity of the DMCA system
- Reward perjury by allowing those who make knowingly false statements under penalty of perjury to profit from their misconduct

Conversely, granting the temporary restraining order:

- Upholds the integrity of the copyright management information system
- Ensures meaningful enforcement of statutory rights against foreign defendants
- Deters future infringement and false counter-notifications
- Protects individual creators against commercial exploitation
- Preserves the Court's ability to grant effective relief

As the Ninth Circuit recognized, "the public has a compelling interest in protecting copyright owners' marketable rights to their work and the economic incentive to continue creating" content. *Disney*, 869 F.3d at 867. The public interest strongly favors the TRO.

### 6.  Ex Parte Relief Is Necessary Because Advance Notice Would Be Futile

---

MEMORANDUM OF LAW ISO APP. FOR TRO, OSC FOR PRELIM. INJ., ASSET RESTRAINT AND ALT. SERVICE
CASE NO.: 3:25-cv-08873-TSH

Federal Rule of Civil Procedure 65(b)(1) permits *ex parte* temporary restraining orders when "specific facts in an affidavit or a verified complaint clearly show that immediate and irreparable injury, loss, or damage will result to the movant before the adverse party can be heard in opposition." Fed. R. Civ. P. 65(b)(1)(A). A TRO "should be restricted to . . . preserving the status quo and preventing irreparable harm just so long as is necessary to hold a hearing and no longer." *E. Bay Sanctuary Covenant v. Trump*, 932 F.3d 742, 779 (9th Cir. 2018) (quoting *Granny Goose Foods, Inc. v. Brotherhood of Teamsters & Auto Truck Drivers Local No. 70*, 415 U.S. 423, 439 (1974)).

Mr. Gharavi respectfully submits that *ex parte* relief is necessary because the asset restraint must be in place to prevent further dissipation through Google's monthly disbursement windows, which occur between the 21st and 26th of each month. Google's recurring monthly disbursement window runs through November 26, 2025, with subsequent windows recurring monthly on the same schedule thereafter. Gharavi Decl. ¶¶ 31, 35. Each monthly disbursement that occurs before the asset restraint takes effect will permanently transfer additional funds beyond the Court's reach. *Id.* ¶¶ 33-34, 46.

Google provides account holders with the ability to voluntarily place payment holds or increase payment thresholds to defer disbursements. *Id.* ¶¶ 32, 46. However, such measures require the account holder's voluntary cooperation—cooperation Defendant has demonstrated he will not provide. After Mr. Gharavi sent him the lawsuit documents on October 19, 2025, Defendant responded by filing two additional false DMCA counter-notifications on October 25, 2025—each containing knowingly false statements under penalty of perjury. *Id.* ¶¶ 21, 25-28, Exs. 5, 7-8. A defendant who commits perjury after being notified of a lawsuit cannot be trusted to voluntarily preserve contested assets. A court order restraining the account is therefore necessary to prevent disbursements during Google's monthly payment windows.

Defendant's pattern of escalating misconduct establishes that he should not be entrusted to voluntarily preserve assets pending a hearing. He filed three DMCA counter-notifications—October 9, October 25 (twice)—each necessarily stating under oath that he had a "good faith belief the material was removed due to a mistake or misidentification." *Id.* ¶¶ 14-15, 25-26, Exs. 4, 7. The side-by-side comparisons establish this sworn statement is objectively false. *Id.* ¶¶ 6-9, 16, Ex. 1. Defendant deliberately removed Mr. Gharavi's watermarks and added his own false branding—conduct wholly

inconsistent with any good faith belief in mistake. Rather than ceasing the challenged conduct after being notified of the lawsuit, Defendant escalated it by filing two more perjurious counter-notifications. *Id.* ¶¶ 21, 25-27, Exs. 5, 7. YouTube rejected both because Defendant used email addresses that did not match the channel owners, demonstrating his pattern of providing false information. *Id.* ¶ 28, Ex. 8.

Advance notice would delay relief, allowing one or more monthly disbursements to occur before the Court can act. Even the minimal procedural requirements—service on Defendant in India, time for any response—would delay the Court's ability to act. Each disbursement window that passes without an asset restraint in place allows additional funds to transfer to Defendant's accounts in India, where they will be irretrievable. The recurring monthly nature of these disbursements, combined with Defendant's demonstrated unwillingness to cooperate, makes immediate *ex parte* relief essential.

These circumstances parallel those in *Viral DRM*, where this district granted an *ex parte* TRO against foreign defendants who monetized infringing YouTube content and filed false counter-notifications. 2023 WL 5601146, at *1-3. The court found that absent immediate relief, defendants would "significantly alter the *status quo* before the Court can determine the parties' respective rights." *Id.* at *2. Like the defendants in *Viral DRM*, Defendant is located in a foreign jurisdiction—India—without reciprocal enforcement mechanisms. Gharavi Decl. ¶¶ 33-34.

Therefore, *ex parte* relief is necessary and appropriate.

## B.  The Court Should Grant Mr. Gharavi's Application for an Order to Show Cause Why a Preliminary Injunction Should Not Issue

Mr. Gharavi satisfies all four Winter factors. An order to show cause will provide Defendant an opportunity to respond and ensure this matter receives full consideration consistent with due process.

A preliminary injunction with the same terms as the temporary restraining order would prohibit Defendant from:

1. Directly or indirectly submitting additional DMCA counter-notifications to YouTube or any other service provider claiming that Mr. Gharavi's DMCA takedown notices are based on mistake or misidentification, or taking any other action to cause the restoration of videos that have been removed pursuant to Mr. Gharavi's DMCA takedown notices;

2. Removing, altering, or falsifying copyright management information, including Mr. Gharavi's

watermarks (which appear as either "© Women.MidwestWrestle.com" or "© MidwestWrestle.com" depending on the video), from any of Mr. Gharavi's copyrighted works, in violation of 17 U.S.C. § 1202(b);

3. Providing or distributing false copyright management information, including adding the "Rocky!" logo or any other false attribution to any videos containing Mr. Gharavi's copyrighted works, in violation of 17 U.S.C. § 1202(a);

4. Monetizing, or causing to be monetized, any of Mr. Gharavi's copyrighted works on YouTube or any other platform;

5. Transferring ownership or control of the YouTube channels @RockyFunTV or @GrapplingFightZone during the pendency of this action, or until further order of the Court;

6. Uploading, copying, displaying, distributing, or creating derivative works of Mr. Gharavi's copyrighted works on any platform; and

7. Withdrawing, transferring, or dissipating any funds in Defendant's Google AdSense account(s) associated with the YouTube channels @RockyFunTV and @GrapplingFightZone during the pendency of this action, or until further order of the Court.

The preliminary injunction would also require Defendant to preserve copies of all computer files relating to the YouTube channels @RockyFunTV and @GrapplingFightZone, and to take all steps necessary to retrieve computer files relating to these channels that may have been deleted.

Mr. Gharavi is likely to succeed on the merits of all his claims, will suffer irreparable harm without injunctive relief, the balance of hardships tips sharply in his favor, and the public interest supports the injunction. These factors support entry of a preliminary injunction pending resolution of this case.

### C.  The Court Should Grant the Requested Asset Restraint Order

#### 1.  Legal Authority for Asset Restraint Orders

The Copyright Act specifically authorizes courts to "grant temporary and final injunctions on such terms as it may deem reasonable to prevent or restrain infringement of a copyright." 17 U.S.C. § 502(a). Similarly, § 1203 of the DMCA provides that courts may "grant temporary and permanent injunctions on such terms as it deems reasonable to prevent or restrain a violation" of the copyright management information provisions. 17 U.S.C. § 1203(b)(1).

The Ninth Circuit permits asset restraints "when the movant shows 'a likelihood of dissipation of the claimed assets, or other inability to recover monetary damages, if relief is not granted.'" *cPanel, LLC v. Asli*, 719 F. Supp. 3d 1133, 1157 (D. Or. 2024) (quoting *Johnson v. Couturier*, 572 F.3d 1067, 1085 (9th Cir. 2009)). Such restraints can extend to "assets which were controlled by a party, even if that party did not expressly own or possess those assets." *F.D.I.C. v. Garner*, 125 F.3d 1272, 1280 (9th Cir. 1997).

Courts "routinely . . . grant asset freezes" "when defendants are overseas where they can hide assets from a potential judgment." *Cisco*, 2020 WL 4196273, at *9. This district has repeatedly granted such relief in copyright cases involving foreign defendants who monetize infringing content on YouTube. In *Viral DRM*, this district granted relief prohibiting defendants from transferring ownership or control of "their YouTube channels and Google AdSense accounts during the pendency of this action," and ordered Google to "immediately freeze the operation of defendants' YouTube channels and AdSense accounts" so defendants are "prohibited from uploading or downloading content, transferring ownership or control, or withdrawing or transferring funds associated therewith." 2023 WL 5601146, at *3. The court found such relief necessary because "defendants all reside outside the United States in countries with weak legal regimes and copyright protections where pursuing defendants for recovery of plaintiff's damages will be impossible." *Id.* at *2.

### 2. An Asset Restraint Is Necessary to Preserve Meaningful Relief

As established in Section III.A.6, Defendant's AdSense funds held by Google LLC in California are the only identified U.S.-based assets, and those funds face automatic monthly disbursement to India where collection would be practically impossible. An asset restraint is therefore necessary to preserve any meaningful remedy.

The restraint here is narrowly tailored to preserve equitable remedies under 17 U.S.C. §§ 504(b), 512(f) and 1203. Courts in this circuit have recognized that freezing payment accounts is often necessary to deliver injunctive relief in copyright cases, particularly where defendants are located abroad and could dissipate U.S.-based proceeds before judgment. *Trial Film LLC v. Wu Daoai*, 2021 WL 2949508, at *4 (D. Ariz. July 14, 2021). Here, without an AdSense restraint, Defendant could automatically transfer funds to India before the Court's judgment, rendering injunctive relief meaningless.

The risk of dissipation is not speculative. As in *cPanel*, "Defendants have taken multiple steps to

hide their identities and avoid [Plaintiff's] scrutiny," and are "located abroad." 719 F. Supp. 3d at 1157. Here, Defendant has demonstrated he will not preserve assets voluntarily. He has filed three counter-notifications containing knowingly false statements under penalty of perjury (Gharavi Decl. ¶¶ 14-16, 25-26, Exs. 4, 7), including two filed after being notified of this lawsuit (*id.* ¶ 25). He uses six different email addresses to avoid detection (*id.* ¶ 12), and YouTube rejected two of his counter-notifications because he used mismatched addresses to conceal his identity (*id.* ¶ 28). A person willing to commit perjury will not hesitate to allow automatic disbursement of contested funds.

The asset restraint is narrowly tailored to the two YouTube channels at issue (@RockyFunTV and @GrapplingFightZone). It does not prevent Defendant from operating his channels or uploading lawful content—it simply prevents withdrawal of proceeds from unlawful conduct pending resolution of this case. If Defendant prevails, the funds will be released. But if Mr. Gharavi prevails and the funds have been automatically disbursed, he will have no remedy whatsoever. The asset restraint is necessary to preserve the Court's ability to grant meaningful relief.

### D.  The Court Should Not Require Mr. Gharavi to Post a Bond

Federal Rule of Civil Procedure 65(c) provides that "[t]he court may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c). The Ninth Circuit has "recognized that Rule 65(c) invests the district court 'with discretion as to the amount of security required, *if any*.'" *Jorgensen v. Cassiday*, 320 F.3d 906, 919 (9th Cir. 2003). "The district court may dispense with the filing of a bond when it concludes there is no realistic likelihood of harm to the defendant from enjoining his or her conduct." *Id.*

No bond should be required here. As this district recently explained in a similar copyright case, "[t]here is no likelihood of harm because the TRO would simply enjoin Defendant from doing something Defendant never had a right to do in the first place." *Invisible Narratives v. Next Level Apps Tech., FZCO*, No. 5:25-CV-01644-NW, 2025 WL 551866, at *4 (N.D. Cal. Feb. 19, 2025) (quoting *Comet Techs. United States of Am. Inc. v. Beuerman*, No. 18-CV-01441-LHK, 2018 WL 1990226, at *6 (N.D. Cal. Mar. 15, 2018)). The temporary restraining order here merely requires Defendant to: (1) stop removing copyright management information, (2) stop adding false copyright management information, and (3)

stop filing knowingly false DMCA counter-notifications. The asset restraint prevents Google from disbursing AdSense proceeds earned through infringement pending adjudication. None of these restrictions causes harm to legitimate conduct—they simply prevent ongoing federal law violations and preserve contested funds.

Moreover, given the clear evidence of Defendant's systematic copyright infringement, DMCA violations, and willingness to file perjurious counter-notifications even after being notified of this lawsuit, no bond is warranted. *See Invisible* Narratives, 2025 WL 551866, at *4 (declining to require bond where defendant engaged in intellectual property infringement); *cPanel*, 719 F. Supp. 3d at 1158 (dispensing with bond "given the willfulness of Defendants' impingement on Plaintiff's intellectual property").

Mr. Gharavi respectfully requests that the Court exercise its discretion and decline to require a bond.

In the alternative, should the Court decline to waive security entirely, Mr. Gharavi respectfully requests that any bond be set at a nominal amount—no more than $500—given his *pro se* status, the clear evidence of Defendant's willful infringement, and the absence of any cognizable harm to Defendant from being enjoined from conduct he has no lawful right to engage in or from having proceeds of alleged infringement temporarily frozen.

## E.  The Court Should Permit Mr. Gharavi to Serve Defendant by Email

### 1.  Legal Standard for Alternative Service

Federal Rule of Civil Procedure 4(f) governs service on individuals in foreign countries. Rule 4(f)(3) provides that service may be accomplished "by other means not prohibited by international agreement, as the court orders." Fed. R. Civ. P. 4(f)(3). This provision grants district courts broad discretion to authorize alternative means of service. *Rio Props.*, 284 F.3d at 1014.

To authorize alternative service under Rule 4(f)(3), the court must find that: (1) service is directed by the court, and (2) service is not prohibited by international agreement. *Id.* Additionally, any method of service must satisfy due process by being "reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Id.* at 1016.

### 2.  Service by Email Is Not Prohibited by International Agreement

India is a signatory to the Hague Convention on the Service Abroad of Judicial and Extrajudicial Documents in Civil or Commercial Matters. However, the Hague Convention does not prohibit email service under Rule 4(f)(3).

As the Supreme Court confirmed in *Water Splash, Inc. v. Menon*, 581 U.S. 271, 137 S. Ct. 1504, 1513 (2017), in cases governed by the Hague Service Convention, service by mail is permissible if two conditions are met: first, the receiving state has not objected to service by mail; and second, service by mail is authorized under otherwise-applicable law. Although India objected to Article 10 of the Hague Convention, which addresses service through "postal channels," that objection does not prohibit email service.

District courts in this Circuit have consistently held that a country's objection to Article 10 does not prohibit service by email under Rule 4(f)(3). *See Microsoft Corp. v. Goldah.com Network Tech. Co.*, No. 17-CV-02896-LHK, 2017 WL 4536417, at *4 (N.D. Cal. Oct. 11, 2017) ("China's objection to Article 10 does not prohibit the email service the Court ordered in the instant case"); *Williams-Sonoma Inc. v. Friendfinder Inc.*, No. C06-06572 JSW, 2007 WL 1140639, at *2 (N.D. Cal. Apr. 17, 2007) (allowing email service on defendants located in countries that objected to service via postal channels); *Facebook, Inc. v. Banana Ads, LLC*, No. 11-cv-3619 YGR, 2012 WL 1038752, at *2 (N.D. Cal. Mar. 27, 2012) (collecting cases holding that the Hague Service Convention does not expressly prohibit email service).

The reasoning is straightforward: "Where a signatory nation has objected to the alternative means of service provided by the Hague Convention, that objection is expressly limited to those means and does not represent an objection to other forms of service, such as e-mail or website posting." *Media Trademark & Licensing Ltd. v. COINGEEKLTD.COM*, No. CV-21-00214-PHX-DWL, 2021 WL 2895289, at *4 (D. Ariz. July 9, 2021) (quoting *Chanel, Inc. v. Individuals, Partnerships & Unincorporated Associations Identified on Schedule "A"*, No. 20-CIV-62121-RAR, 2020 WL 8226841, at *2 (S.D. Fla. Nov. 4, 2020)). "A court acting under Rule 4(f)(3), therefore, remains free to order alternative means of service where a signatory nation has not expressly objected to those means." *Chanel*, 2020 WL 8226841, at *2.

This principle applies with full force to India. Multiple courts have authorized email service on defendants in India under Rule 4(f)(3). *See Zoho Corp. v. Target Integration, Inc.*, No. 23-CV-00054-SI,

2023 WL 2837676, at *4 (N.D. Cal. Apr. 7, 2023) (granting alternative service by email on Indian defendants); *Richmond Techs., Inc. v. Aumtech Bus. Sols.*, No. 11-CV-02460-LHK, 2011 WL 2607158, at *14 (N.D. Cal. July 1, 2011) (same).

In *Zoho*, this district confronted the precise question presented here: whether to authorize email service on defendants in India. The court held that "although India is a signatory to the Hague Convention, India has 'formally objected to service under Article 10, and does not permit service via postal channels.'" *Zoho*, 2023 WL 2837676, at *3 (citations omitted). Nonetheless, the court found that "numerous courts have authorized alternative service under Rule 4(f)(3) even where the Hague Convention applies," (*id.* (quoting *Richmond Techs.*, 2011 WL 2607158, at *12)), and authorized service by email. *Id.* at *5.

Similarly, in *Richmond Technologies*, this district authorized alternative service where the plaintiff faced delay and potential irreparable harm. 2011 WL 2607158, at *13. The court found that "alternative service under Rule 4(f)(3) is warranted" because the plaintiff had "presented issues that require resolution with greater urgency than the Hague Convention process can accommodate." *Id.* The court noted the plaintiff's contention that service through India's Central Authority would take "between six and eight months," (*id.* at *11), during which the plaintiff would suffer harm to its goodwill and business reputation. *Id.* at *21-22.

Here, email service is appropriate and warranted. India has not objected to email service specifically—its Hague objection is expressly limited to postal channels. Moreover, like the plaintiff in *Richmond Technologies*, Mr. Gharavi faces significant delays through India's formal service channels and ongoing irreparable harm from Defendant's continued infringement during those delays. Courts in this Circuit have repeatedly found these circumstances sufficient to authorize email service under Rule 4(f)(3). The circumstances here make email service not merely permissible, but necessary.

### 3.  Email Service Is Reasonably Calculated to Provide Actual Notice

Email service satisfies due process because it is "reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Rio Props.*, 284 F.3d at 1016. In *Rio Properties*, the Ninth Circuit approved email service where the defendant had "embraced the modern e-business model and profited immensely from it." *Id.* at 1017-18.

The circumstances here are even more compelling. Defendant stated in his counter-notification that he "will accept service of process from the claimant." Gharavi Decl. ¶ 37, Ex. 4. While this does not constitute express consent to a specific method of service, when combined with Defendant's exclusive use of email for all communications regarding this dispute—including filing three counter-notifications and corresponding with Plaintiff—it supports the conclusion that email service will effectively apprise Defendant of this action. *See Invisible Narratives*, 2025 WL 551866, at *4-5 (granting email service where defendant communicated with plaintiff via email regarding copyright dispute and submitted DMCA notices using those email addresses). Mr. Gharavi sent complete service packages on October 19 and October 26, 2025, to all six addresses without any bounced emails or delivery failures. Gharavi Decl. ¶¶ 21-22, 24, 38, Exs. 5, 9.

Therefore, email service to Defendant's six active email addresses is reasonably calculated to apprise him of this action and comports fully with due process.

### 4. The Particularities of This Case Necessitate Alternative Service

The Ninth Circuit has made clear that plaintiffs seeking alternative service under Rule 4(f)(3) need "only to demonstrate that the facts and circumstances of the present case necessitated the district court's intervention." *Rio Props.*, 284 F.3d at 1016. Several compelling factors demonstrate that intervention is necessary here.

**First**, Defendant has actively used the six email addresses at issue for all communications related to this dispute. Between October 5-8, 2025, Defendant sent Mr. Gharavi 19 emails from these six addresses disputing the DMCA takedowns. Gharavi Decl. ¶¶ 12-13, Ex. 3. Significantly, Defendant used the same email address (kpanuj34@gmail.com) to represent himself as the operator of both YouTube channels, establishing that he monitors and actively uses these email accounts for all dispute communications. *Id.* ¶ 6. Defendant provided one of these addresses (kumaranuj85141@gmail.com) in his DMCA counter-notification as his official contact information. *Id.* ¶ 36, Ex. 4. On October 25, 2025—six days after Mr. Gharavi sent the lawsuit documents to all six addresses—Defendant filed two additional counter-notifications, demonstrating his ongoing engagement with this subject matter. *Id.* ¶¶ 25, 36, Ex. 7. As the Ninth Circuit recognized in *Rio Properties*, email service is particularly appropriate for defendants who have embraced e-mail technology and used it in the conduct of their business. 284

F.3d at 1017-18.

**Second**, Mr. Gharavi has already made two documented service attempts via these email addresses—on October 19 and October 26, 2025—sending complete service packages including the summons, complaint, and waiver forms. *Id.* ¶ 38, Exs. 5, 9. Neither email bounced or generated delivery failures, confirming all six addresses remain active. *Id.* Moreover, Defendant expressly consented in his counter-notification to "accept service of process from the claimant" in this judicial district. *Id.* ¶ 37, Ex. 4. While this consent does not specify email as the method, it demonstrates Defendant's willingness to accept service and his awareness that litigation would follow his false counter-notification.

**Third**, traditional Hague Convention service would take six to eight months and defeat the purpose of this litigation. During this delay, Defendant could dissipate the AdSense funds—the only U.S.-based recoverable assets. *Id.* ¶ 29. Google's recurring monthly disbursement window runs through November 26, 2025, with subsequent windows recurring monthly thereafter. *Id.* ¶¶ 31, 35. Defendant has already demonstrated willingness to engage in deceptive conduct by filing three counter-notifications containing knowingly false statements under penalty of perjury, including two filed after being notified of this lawsuit. *Id.* ¶¶ 14-16, 25-26, 41, Exs. 4, 7. The delay inherent in Hague Convention service would allow automatic disbursement of contested funds and render any eventual judgment worthless.

Courts have authorized alternative service under less compelling circumstances. In *Richmond Technologies*, the court authorized service on defendants' attorney where plaintiffs faced delay and irreparable harm. 2011 WL 2607158, at *11-14. In *Zoho*, this district authorized email service on India-based defendants despite the Hague Convention. 2023 WL 2837676, at *3-5. Here, the case for email service is even stronger—Mr. Gharavi seeks service directly to Defendant's own actively-monitored email addresses, to which Defendant has already received the lawsuit documents and responded by filing additional counter-notifications.

These particularities—an India-based infringer using email exclusively, escalating misconduct after service, and the likelihood of asset dissipation—necessitate email service under Rule 4(f)(3).

## IV.    CONCLUSION

For the foregoing reasons, Mr. Gharavi respectfully requests that the Court grant his application for:

1. A temporary restraining order as described herein;

2. An order to show cause why a preliminary injunction should not issue;

3. An order restraining transfer of assets held in Defendant's Google AdSense accounts;

4. An order permitting alternative service by email to Defendant's six active email addresses; and

5. Such other and further relief as the Court deems just and proper.

Dated: November 22, 2025

Respectfully submitted,

/s/ Nima Gharavi

Nima Gharavi

Plaintiff, *pro se*